| | |
|---|---|
| AMERICAN EAGLE OUTFITTERS, INC.<br>and RETAIL ROYALTY COMPANY )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>AMERICAN EAGLE FURNITURE, INC., )<br>d/b/a TITANIC FURNITURE; WOODFIELD )<br>FURNITURE, INC.; GURNEE MILLS )<br>FURNITURE, INC.; TONY ALCHUILITI, )<br>JAY NOURI, TAMMAN ABOUSSAF, )<br>OUDIE ABOUSSAF, and HOUSSAM )<br>ALCHRITI, individually and doing business )<br>as AMERICAN EAGLE FURNITURE and )<br>TITANIC FURNITURE, )<br> )<br>Defendants. ) | No. 11 C 02242<br><br>Judge Edmond E. Chang |

## MEMORANDUM OPINION AND ORDER

Plaintiffs American Eagle Outfitters and Retail Royalty Company (collectively AE Outfitters) brought this lawsuit against Defendants American Eagle Furniture, two related furniture companies, and five of the companies' owners and employees (collectively AE Furniture or Defendants). AE Outfitters is pursuing eight independent claims against Defendants: (1) federal trademark infringement under section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) federal unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) federal dilution of AE Outfitter's mark under section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (4) cancellation of the registration of AE Furniture's mark under section 14 of the Lanham Act, 15 U.S.C. § 1064; (5) state-law dilution, 765 ILCS 1036/65; (6) common-law unfair competition;

(7) state unfair and deceptive trade practices, 815 ILCS 510/1 to 510/7; and

(8) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815

ILCS 505/2. R. 35, Am. Compl. ¶ 3.[1] Defendant has asserted two affirmative defenses

in response: laches and genericness. R. 37, Answer at 35-36. AE Outfitters has moved

for summary judgment on the federal and state infringement and unfair-competition

claims (Claims 1, 2, 6, and 7), the cancellation claim (Claim 4), as well as Defendants'

laches and genericness defenses. R. 48, Pls.' Mot. Summ. J.[2] AE Furniture has filed a

cross-motion on the laches defense and a stand-alone summary-judgment motion on

the federal dilution claim (Claim 3). R. 58, Defs.' Mot. Summ. J. For the reasons

discussed below, AE Outfitters' motion is granted and Defendants' motion is denied.

## I. Background

In deciding the parties' cross-motions for summary judgment, the Court views

the evidence in the light most favorable to the respective non-moving party. *Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Plaintiff AE

---

[1]The Court has subject matter jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1338(a)-(b), and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

Citation to the docket is "R." followed by the entry number and, when necessary, the page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "PSOF" (for Plaintiffs' Statement of Facts) [R. 50], and "DSOF" (for Defendants' Statement of Facts) [R. 61]. To streamline the briefing on the parties' cross-motions for summary judgment, the parties filed four, instead of six, briefs. To simplify citations, the Court will refer to these briefs as follows: R. 47, Plaintiffs' Opening Brief (Pls.' Br.); R. 62, Defendants' Combined Opening and Response Brief (Defs.' Resp. Br.); R. 67, Plaintiffs' Combined Response and Reply Brief (Pls.' Reply Br.); and R. 70, Defendants' Reply Brief (Defs.' Reply Br.).

[2]Neither party is seeking summary judgment on Claim 5 (the state dilution claim) or Claim 8 (the claim under the Illinois Consumer Fraud and Deceptive Businesses Practices Act). *See* Defs.' Resp. Br. at 2.

Outfitters owns and operates a chain of retail stores that offers privately branded apparel and accessories under the registered marks "American Eagle" and "American Eagle Outfitters." PSOF ¶¶ 1, 16; R. 52, Gibbs Decl., Exh. 1; R. 60, Yi Decl., Exh. 10.[3] The company opened its first retail store in 1977 and now operates around 860 stores in the United States, 95% of which are located in shopping malls. DSOF ¶ 45; PSOF ¶ 13. Each month, 30 million customers walk through AE Outfitters' stores, and 20 million customers visit its website. DSOF ¶ 62. And in recent years, the company has generated billions of dollars each year in retail sales. PSOF ¶ 20; *see also* R. 53, Grover Decl. ¶ 14. AE Outfitters has also launched other retail sub-brands over the years, including Aerie by American Eagle, 77kids by American Eagle, and Martin+OSA. PSOF ¶ 15. AE Outfitters primarily targets consumers between the ages of fifteen and twenty-five, but there is ultimately no cap on the age of the consumer to whom it markets. DSOF ¶¶ 35, 71. The company's annual budget for reaching its target market is $52 million. *Id.* ¶ 69.

Although the company specializes in clothing apparel, jewelry, and accessories, AE Outfitters offered a furniture line known as First Apartment from 2004 to 2005. *Id.* ¶¶ 23-24, 40, 82-83; PSOF ¶¶ 16, 19. The company did not sell large furniture items such as sofas, but it did sell smaller pieces, including chairs, ottomans, stools, small tables, floor cushions, rugs, laundry baskets, and furniture accessories like pillows,

------

[3]Retail Royalty Company is a wholly owned subsidiary of AE Outfitters and owns all the rights to the American Eagle marks, which it licenses to AE Outfitters' retail entities. PSOF ¶ 2.

blankets, and frames. DSOF ¶¶ 30-33, 51; PSOF ¶ 19. These items ranged in price from $20 to $50. DSOF ¶ 38. AE Outfitters' management has discussed selling furniture again in the future. *Id.* ¶¶ 34, 87, 95; PSOF ¶ 17.

Defendants Tamman and Oudie Absoussaf, AE Furniture's owners and principal officers, have operated AE Furniture as a wholesale furniture warehouse under the name "Titanic Furniture" since July 2005. PSOF ¶¶ 34, 38. Through their Titanic wholesale warehouse, catalog, and website (www.titanicfurniture.com), Defendants sell furniture products to over 650 retail stores nationwide. DSOF ¶ 89; PSOF ¶ 35. In 2006, Defendants applied to the United States Patent and Trademark Office (PTO) to register their design mark "American Eagle Furniture Your Home's Best Friend," which is the phrase that appears in front of an eagle and is superimposed on an American-flag background. *See* PSOF ¶ 40; R. 55, Hooker Decl., Exh. 32, AEF Application. Significantly, the trademark[4] that was ultimately registered (Reg. No. 3,428,434) in 2008 applies only to "wholesale stores featuring furniture." R. 55-3, 30(b)(6) Dep. Exh. 16, AEF Serv. Mark. Yet Defendants do *not* use their AE Furniture design mark on the signage for the Titanic warehouse or on Titanic's catalog or website. DSOF ¶ 90; PSOF ¶¶ 36, 39, 49. They only use the mark on tags that they directly attach to some of their furniture products. DSOF ¶ 90.

---

[4]As discussed more fully below in the Analysis section, this mark was technically a service mark, not a trademark. Many courts use the terms interchangeably, however, and the Court will as well, except where the distinction is relevant. *See* 87 C.J.S. *Trademarks, Etc.* § 30 (2013).

In 2009, the Aboussafs, along with Defendants Jay Nouri, Tony Alchuiliti, and Houssam Alchriti, expanded AE Furniture's operations and opened AE Furniture *retail* stores in three Chicago-area shopping malls where AE Outfitters already had retail stores. PSOF ¶¶ 50-53, 55. Although they did not use the AE Furniture design mark on their signs, the Defendants used the words "American Eagle Furniture," in solid capital letters, on the signs above their new retail stores. *Id.* ¶¶ 49-50, 57-60. The parties' signs are not identical, but they do use similar capitalization and font. *See* Pls.' Br. at 2 (photos of each of the stores' signs). The stores at the Gurnee Mills and Fox Valley Malls closed in 2011, but the AE Furniture store at the Woodfield Mall is still open. PSOF ¶¶ 4-5, 56, 60. AE Furniture's target retail consumers are between the ages of twenty-five and sixty, and its most significant customer group is people ages thirty to thirty-eight. DSOF ¶ 100.

Since the opening of AE Furniture's retail stores, AE Outfitters has documented many instances of consumer confusion stemming from the similarity between the parties' names, including misdirected deliveries, customers believing that they could redeem AE Outfitters' consumer loyalty program rewards at AE Furniture stores, and consumers stating that they did not know AE Outfitters had furniture stores (this latter category of customers believed, in other words, that the AE Furniture stores were AE Outfitter furniture stores). *See* PSOF ¶ 68; *see also* Hooker Decl., Exhs. 12-28. In response, soon after learning about AE Furniture's retail stores in June 2010, AE Outfitters sent demand letters to the owners of each store, requesting that they stop using the "American Eagle Furniture" and "American Eagle" marks for their retail

goods and services. DSOF ¶¶ 21-22; PSOF ¶ 65-66. Defendants received these letters, but they did not respond. DSOF ¶ 92; PSOF ¶ 66. AE Outfitters sent two additional rounds of demand letters in July and August 2010, but again, the Defendants did not respond. PSOF ¶ 66. AE Outfitters then filed this lawsuit in April 2011. R. 1.

## II. Legal Standard

Courts apply the usual Rule 56 standard when reviewing cross-motions for summary judgment, but must be careful to draw reasonable inferences in the correct direction when evaluating the cross-motions. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary-judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only competent evidence of a type otherwise admissible at trial, *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Trademark Infringement and Unfair Competition (Claims 1, 2, 6, and 7)

AE Outfitters moves for summary judgment as to liability on its trademark infringement and unfair competition claims under federal and state law. The Seventh Circuit has assumed without deciding that the same standard applies to both the federal and Illinois claims. *See Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 523 (7th Cir. 2012); *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007); *cf. also Tarin v. Pellonari*, 625 N.E.2d 739, 745-46 (Ill. App. Ct. 1993). To prevail on all of these claims, AE Outfitters "must establish that (1) its mark[s] [are] protectable and (2) [Defendants'] use of the mark is likely to cause confusion among consumers." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001). The parties dispute only the second element of this test: the likelihood of confusion. *See* Defs.' Resp. Br. at 10 (confining their arguments to the likelihood-of-confusion factors).

Because the Court concludes that AE Outfitters is entitled to summary judgment on the likelihood-of-confusion issue, it is worth explaining, at the outset, the caution with which courts must approach such fact-bound trademark cases. "[A] motion for summary judgment in trademark infringement cases must be approached with great caution." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993). Generally, courts should only resolve the likelihood-of-confusion question

7

on summary judgment "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) (internal quotation marks and citation omitted). Despite this cautionary standard, granting summary judgment for a trademark owner is not an unprecedented anomaly. *See, e.g.*, *CAE*, 267 F.3d at 664, 687 (affirming summary judgment for the plaintiff); *cf. also Packman v. Chi. Tribune Co.*, 267 F.3d 628, 646 (7th Cir. 2001) (affirming summary judgment for the defendant); *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996) (same). Indeed, as discussed below, the similarities between *CAE* and this case reinforce the conclusion that granting summary judgment for AE Outfitters is appropriate here.

Courts analyze seven factors to determine whether consumers are likely to be confused:

> (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another.

*AutoZone*, 543 F.3d at 929 (citation omitted). "No single factor is dispositive." *Id.* But three factors—the similarity of the marks, actual confusion, and the defendant's intent—are "particularly important." *Id.* The Court analyzes each of these factors in turn.

### 1. Similarity of the Marks

To determine whether two marks are similar, courts should compare the marks "in light of what happens in the marketplace and not merely by looking at the two

marks side-by-side." *Id.* at 930 (internal quotation marks and citation omitted). Here, the salient portion of both marks—the words "American Eagle"— is identical. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001) ("[I]f one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." (internal quotation marks and citation omitted)). The "American Eagle" phrase is the salient part of the marks—the part that matters—because "Outfitters" and "Furniture" are, on their own, generic. Defendants have prominently incorporated "American Eagle" into their store signage. And although their registered-on-paper design mark incorporates an elaborate graphic and a longer word mark ("American Eagle Furniture Your Home's Best Friend"), they do *not* actually use this design mark on their retail store signs. And, like AE Outfitters' store signs, all of the words on Defendants' signs are also in capital letters, using similar font. *See* Pls.' Br. at 2; *see also AutoZone*, 543 F.3d at 930 (comparing the font and stylization of the parties' signs). In short, using an identical mark (the "American Eagle" part of the mark) and a similar presentation weighs in favor of confusion. *See CAE*, 267 F.3d at 678.

## 2. Similarity of the Products

The second factor concerns the similarity of the products bearing the "American Eagle" mark. Defendants argue that this factor tips toward them because the Defendants sell furniture and AE Outfitters primarily sells clothing. Defs.' Resp. Br. at 12. But "a likelihood of confusion may exist even if the parties are not in direct competition, or their products and services are not identical." *CAE*, 267 F.3d at 679

(citation omitted). Their products need only be "closely related." *Id.*;*see also Int'l Kennel Club of Chi., Inc. v. Mighty Star Inc.*, 846 F.2d 1079, 1089 (7th Cir. 1988) (agreeing that the plaintiff's service of promoting and sponsoring dog shows was sufficiently related to the defendant's toy-dog products to cause confusion). Indeed, "an important reason to protect trademark owners against the use of similar marks on closely related products is to protect the owner's ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future." *CAE*, 267 F.3d at 681 (internal quotation marks and citation omitted). Finally, it is especially reasonable to expect that a plaintiff might branch out into marketing a new product when that plaintiff has historically offered that product in the past. *See id.* (agreeing that evidence that the plaintiff had previous experience in the defendant's line of business weighed in favor of finding a likelihood of confusion).

Here, because the parties' products do overlap and because they overlap in the same retail-sales markets, it is reasonable to expect that consumers would be confused about the source of Defendants' furniture. Although AE Outfitters does not currently sell large furniture, it does have a diverse range of products. It does not only sell clothing; it has also sold home furnishings, such as rugs, pillows, picture frames, floor cushions, chairs, stools, laundry baskets, lamps, indoor lighting, window curtains, magazine racks, memory boards, and wall clocks. *See* Hooker Decl., Exh. 11, Defs.' Resp. Pls.' Reqs. Admis. ¶¶ 77-79. AE Outfitters also points out that customers might reasonably expect the company to expand into retail furniture sales in the future because many other apparel retailers have done the same. Pls.' Reply Br. at 5; *see also*

PSOF ¶ 5. Finally, both parties are in the same three malls, making the furniture distinction less important. As a result, this factor also tips in favor of AE Outfitters, even if not overwhelmingly so.

### 3. Area and Manner of Concurrent Use

The third factor also tips in favor of AE Outfitters. Focusing solely on how the parties have used the American Eagle mark as applied to furniture, Defendants argue that this factor weighs in their favor. *See* Defs.' Resp. Br. at 12-13. They emphasize that when AE Outfitters sold furniture as part of its First Apartment project, it sold the furniture only over the Internet and never in its retail stores. *Id.*; *see also* DSOF ¶ 82. Moreover, Defendants suggest that AE Outfitters abandoned its mark for use in furniture sales when it discontinued its First Apartment project. *See* Defs.' Resp. Br. at 12; *see also* DSOF ¶¶ 40, 54.

But rather than focusing on the products to which the mark is applied, this concurrent-use factor assesses "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *CAE*, 267 F.3d at 681 (internal quotation marks and citation omitted). And when analyzed in this light, the factor tips toward AE Outfitters. First, like the parties in *CAE*, the parties here use the "American Eagle" mark in a similar manner because they use it as the first component of the names on their retail stores' signs. *See id.* at 681-82 (recognizing that both parties used "CAE" as the first component in their subsidiaries' and departments' names). Second, both parties have "targeted the same general audience." *Id.* at 682. Defendants do not dispute that both parties target the shoppers in the three malls

11

where Defendants opened their retail stores and where AE Outfitters was already operating. *See* Defs.' Resp. Br. at 13. Indeed, both parties rely primarily on their retail stores to attract foot traffic at all three malls. *See* Hooker Decl., Exh. 3, T. Aboussaf Dep. at 198-99; Hooker Decl., Exh. 8, Kubinski Dep. at 29. Thus, this factor weighs in favor of a likelihood of confusion.

### 4. Degree of Care Likely to Be Exercised by Consumers

"The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE*, 267 F.3d at 683. AE Outfitters emphasizes in its briefs that both parties target the same consumer base: shoppers in suburban malls. Pls.' Br. at 26. It also argues that both parties' products are affordable. *Id.* But as Defendants point out, the difference in price between the parties' products is substantial. *See* Defs.' Resp. Br. at 13. AE Outfitters' products generally range in price from a few dollars to $150. Grover Decl. ¶ 7. In contrast, Defendants sell their products at prices ranging from $49 to $1,299, with most products costing several hundred dollars. *See* T. Aboussaf Dep., 30(b)(6) Dep. Exh. 20. Given this significant disparity in price, the Court agrees with Defendants that consumers will likely exercise a lower degree of care when buying clothing than when buying furniture.

But even assuming that furniture shoppers will exercise more care than clothing customers, AE Outfitters argues that mall shoppers may also experience initial-interest confusion. Pls.' Br. at 27. Initial-interest confusion is actionable under the Lanham Act and "occurs when a customer is lured to a product by the similarity of the

12

mark, even if the customer realizes the true source of the goods before the sale is consummated." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002). This kind of confusion, even if later dispelled, still harms the trademark owner because it is still the "misappropriation of [the plaintiff's] good will." *Id.* at 812-13. For instance, "[c]ustomers believing they are entering the first store rather than the second are still likely to mill around before they leave." *Id.* at 813. In fact, the Seventh Circuit has explained that initial-interest confusion could arise when a junior user "post[s] a sign with another's trademark in front of one's store." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 300 F.3d 1036, 1064 (7th Cir. 1999). AE Outfitters correctly points out that initial-interest confusion is all the more likely to happen here because other apparel companies have also expanded to offer furniture and home goods, so AE Outfitters' customers' interest in furniture made by AE Outfitters is likely to draw customers into the furniture store, even if eventually the confusion is dispelled. Pls.' Br. at 27 (citing Defs.' Resp. Pls.' Reqs. Admis. ¶¶ 82-105). In sum, with customer scrutiny high but initial-interest confusion possible, this factor is closely balanced between the parties. But because the Court must construe the facts in the light most favorable to Defendants on this issue, this factor ultimately tips ever so slightly toward Defendants at this stage of the case.

### 5. The Strength of AE Outfitters' Mark

Next, the evidence in the record is sufficient to rule out any genuine issue of fact as to the strength of AE Outfitters' marks: the marks are strong.[5] "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone*, 543 F.3d at 933. Defendants first argue that this factor is irrelevant to the infringement analysis because AE Outfitters has admitted that it targets consumers between the ages of fifteen and twenty-five whereas Defendants say that they target a different set of customers. Defs.' Resp. Br. at 13 (citing DSOF ¶ 35); *see also id.* at 5-6 (making a similar niche-fame argument in support of their summary-judgement motion on the federal dilution claim). But this argument misses the mark because having a niche-customer demographic does not undermine the strength of the mark in relation to the consuming public at large. *Cf.* 15 U.S.C. § 1125(c)(2)(A) (explaining that for purposes of establishing a federal dilution claim "a mark is famous if it is widely recognized by the *general consuming public* of the United States as a designation of source of the goods or services of the mark's owner" (emphasis added)). Besides, even before they opened their retail stores, Defendants themselves admitted that AE

---

[5]This factor substantially overlaps with the "famous"-or-not element in the test for the federal dilution claim (Claim 3). To prove dilution under 15 U.S.C. § 1125(c), AE Outfitters must show (1) its mark is famous; (2) Defendants used the mark after the mark became famous; (3) Defendants' use of the mark diluted the mark; and (4) Defendants' use of the mark was commercial and in commerce. *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000). On the dilution issue, the parties' debate only whether AE Outfitters' mark is famous. *See* Defs.' Resp. Br. at 4-7 (discussing only the fame element); Defs.' Reply Br. at 6-7 (same). Because of this overlap, the Court discusses these issues together, always bearing in mind the need to draw reasonable inferences for the non-movant.

Outfitters "is a well know[n] shopping mall clothing store." Hooker Decl., Exh. 34, AEF Resp. Office Action.

Defendants also challenge the admissibility of several press reports ranking the strength or fame of various companies' brands that AE Outfitters has submitted in support of its motion. *See* Defs.' Reply Br. at 6-7 (discussing the federal dilution claim); *see also* Grover Decl., Exh. 9. Defendants contend that AE Outfitters has failed to lay a proper foundation for these reports and failed to provide evidence on their reliability. *Id.* at 6.[6] But even if the Court were to ignore the press reports, there is other evidence amply supporting the strength and fame of AE Outfitters' mark. First, AE Outfitters' mark is inherently distinctive. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (explaining that suggestive, arbitrary, and fanciful marks are inherently distinctive and therefore entitled to protection). Although "Outfitters" alone is not distinctive, *see In re Retail Royalty Co.*, Nos. 77791067, 77979784, 2011 WL 1060724, at *6 (T.T.A.B. Mar. 9, 2011), "American Eagle," the most salient part of the mark, is

---

[6]It is possible that AE Outfitters did lay a proper foundation. AE Outfitters attached these reports, which it does not offer as expert testimony, to an affidavit attesting that they were "unsolicited, popular press reports." Grover Decl. ¶ 15. Consequently, these reports are self-authenticating under Federal Rule of Evidence 902(6). And any issues related to the reliability of these reports would typically go to the weight of the evidence, not to whether the Court or fact-finder should consider the reports in the first place. *See AHP Subsidiary*, 1 F.3d at 618. The question is not so much foundation as whether there is a hearsay exception that would permit AE Outfitters to rely on the brand rankings for the truth of the matters asserted. It is possible that AE Outfitters could reduce, at trial, the brand rankings to admissible evidence by introducing the underlying surveys that generated the rankings, but it does not appear that the underlying evidence was disclosed during discovery. Even discounting these reports' rankings as accurate, the sheer volume of unsolicited and widespread popular media coverage that AE Outfitters receives could be considered evidence of the mark's strength. *See* Grover Decl., Exh. 9. In any event, as discussed in the text, none of this evidence is needed to show that the mark is strong.

an arbitrary mark because "it neither describes nor suggests [AE Outfitters'] product or service," *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 611 & n.2 (7th Cir. 1965) (holding that"Americana" was an arbitrary mark as applied to a hotel). The strength of AE Outfitters' mark is also demonstrated by its duration of use, annual sales, and advertising and marketing expenditures.[7] *See CAE*, 267 F.3d at 684-85 (affirming the district court's conclusion that the plaintiff's mark was strong because the plaintiff had used the mark for over forty years, had earned millions of dollars in annual sales, and expended tens of thousands of dollars promoting its business). AE Outfitters has used the mark since 1977. PSOF ¶ 13. Moreover, it generates billions of dollars each year in retail sales and expends millions of dollars each year on marketing. *Id.* ¶ 20; R. 51, Eshleman Decl. ¶ 4; *see also* Grover Decl. ¶ 12. The company has 30 million customers walking through its stores every month, 20 million visitors to its website, 6 million Facebook "fans" (44,000 of whom live in the Chicago area), 120,000 "followers" on Twitter, and 17 million customers in its loyalty program. Kubinski Dep. at 27, 43. And although the company's target consumer is between the ages of fifteen and twenty-five, many of its customers are older. For example, 52% of the active customers in the company's database are over the age of twenty-five. *Id.* at 30. And of its loyalty program customers, more than 44% of the members are over the

---

[7]Courts evaluate a similar non-exhaustive list of factors when determining whether a mark is famous. *See* 15 U.S.C. § 1125(c)(2)(A) ("(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties[;] (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark[; and] (iii) The extent of actual recognition of the mark.").

age of twenty-five and more than 32% are over the age of thirty. Grover Decl. ¶ 11. In short, the strength-of-the-mark factor also weighs in AE Outfitters' favor, even without considering the press reports of brand strength.[8]

### 6. Actual Confusion

Also weighing in favor of a likelihood of confusion is the actual confusion that AE Outfitters has documented. In support of its summary-judgment motion, AE Outfitters has submitted seventeen affidavits, primarily from current and former store managers documenting over 100 instances of actual confusion.[9] *See* Hooker Decl., Exhs. 12-28; *see also* PSOF ¶ 68. In response, Defendants argue that the Court should not consider these affidavits because they contain inadmissible hearsay. Defs.' Resp. Br. at 14. Alternatively, even if these affidavits are admissible, Defendants argue that, at most, they demonstrate only *de minimis* confusion. *See id.* at 14-16. Neither argument is persuasive.

First, these statements are not hearsay because they are not offered for the truth of the matter asserted. *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and*

---

[8]Because AE Outfitters has demonstrated that there is no genuine issue of material fact on the strength of its mark, it has also defeated Defendants' summary-judgment motion on the federal dilution issue. The Court therefore denies Defendants' motion. The federal dilution claim thus remains in the case, specifically because the parties have not resolved the issue of whether Defendants' use of the mark *diluted* the mark—the third element of the test. *See Eli Lilly*, 233 F.3d at 466.

[9]Defendants argue that the misdirected deliveries that AE Outfitters documented are not evidence of confusion because the rear entrances of stores where deliveries are made are labeled by number and not by store name. Defs.' Resp. Br. at 15 n.2 (citing T. Aboussaf Dep. at 205). But even setting aside these incidents, AE Outfitters has still documented over 100 instances of actual confusion. Pls.' Reply Br. at 4.

*Unfair Competition* § 23:15 (4th ed.) (last updated on Westlaw Dec. 2013) ("[I]t is clear that testimony from the plaintiff-trademark owner's employees or others about what customers have told them about their mistaken beliefs should not be excluded from evidence as 'hearsay.' . . . Rather, it is only being offered to prove the state of mind of those . . . customers . . . ."); *see also Int'l Kennel Club*, 846 F.2d at 1090 (rejecting the defendants' hearsay argument and agreeing that "the letter, phone calls, and inquiries received by the plaintiff, as well as the testimony of plaintiff's employees, constitute probative evidence of a likelihood of confusion").[10] For example, the statement "Oh yeah, we saw your brand's furniture store in the mall, too" is not offered as proof that AE Outfitters in fact has such a store, but rather to show the customers' (mistaken) belief and confusion. Hooker Decl., Exh. 22, Vogel Decl. ¶ 8. Moreover, these statements of confusion, even if they were hearsay, would still be admissible under

_____

[10]Although Defendants do not cite these cases, the Court notes that *CAE*, 267 F.3d at 686, and *Smith Fiberglass Products, Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330-31 & n.2 (7th Cir. 1993), provide potential support to their argument that the Court should disregard these affidavits. Nevertheless, these cases are distinguishable. First, in neither opinion was the speaker the plaintiff's customer. *See CAE*, 267 F.3d at 686 (emphasizing that the speaker was one of the plaintiff's suppliers, not a customer); *Smith*, 7 F.3d at 1330-31 (declining to reverse the district court's finding that the plaintiff's employee's testimony about statements made by an unidentified "gentleman" at a trade show was inadmissible). Next, *CAE* also discredited the plaintiff's employee's testimony because it did not provide a time frame for when the speaker made the statement. *CAE*, 267 F.3d at 686. What's more, *CAE* did not exclude the statement entirely; instead, it only concluded that the employee's testimony was "not entitled to great weight." *Id.*; *cf. also Smith*, 7 F.3d at 1331 (concluding that the district court properly discounted the statement from the sole confused "gentleman" because this was the only evidence of actual confusion in the record and was therefore "de minimis"). Here, by contrast, there are over 100 documented statements weighing on actual confusion, most of the affidavits identify the speakers as AE Outfitters' customers, and in most instances they give a specific time frame for when the affiant heard the statements. *See* Hooker Decl., Exhs. 12-28. The Court therefore finds that the affidavits are admissible and provide persuasive evidence of actual confusion.

Rule 803(3) as evidence of the customers' "then-existing state of mind." Indeed, these customer statements expressing the confused notion that AE Outfitters was selling furniture at Defendants' stores is a good example of why there is a state-of-mind exception to the hearsay rule: these customers had no reason to make up the content of their statements.

Next, Defendants also challenge these affidavits by arguing that they only demonstrate *de minimis* confusion. *See* Defs.' Resp. Br. at 14-16. Defendants suggest that AE Outfitters' affidavits demonstrate that only 0.00797% of its potential customers are actually confused about Defendants' use of the mark. *Id.* at 15. Defendants arrive at this percentage by purporting to calculate the estimated number of potential customers that pass through AE Outfitters' stores at the three malls in question during a two-year period. They then divide that estimate by the number of alleged incidents of actual confusion. *Id.*

It is true that the Seventh Circuit has recognized that "*de minimus* evidence of actual confusion does not necessarily establish a likelihood of consumer confusion." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 729 (7th Cir. 1998); *see also Packman*, 267 F.3d at 645 (listing cases). But in order to characterize the confusion evidence as *de minimis*, Defendants engage in speculation at each step of the calculation. For one, Defendants assume without support that all of AE Outfitters' potential customers are evenly distributed among all of its stores. Instead of figuring out the number of customers for these three particular stores, Defendants extrapolate an estimate from AE Outfitters' overall national statistics. *See* Defs.' Resp.

Br. at 15. Second, Defendants' calculations also fail to account for the fact that AE Outfitters does not necessarily have access to all of the confused customers—that is, the customers who walked into *Defendants*' stores thinking that it was an AE Outfitters furniture store. Given that infringement occurs when an alleged infringer tries to free-ride off of the mark-owner's goodwill, those customers would count toward the confusion calculation just as much as those who eventually told AE Outfitters that they had been confused. Finally, Defendants' calculations probably do not capture the under-reporting of actual confusion. 4 *McCarthy* § 23:12 (recognizing that evidence of actual confusion is "almost impossible to secure" because "confusion often go[es] unreported or unrecorded" and because "[p]ersons who are truly confused will often never be aware of the deception" (internal quotation marks and footnotes omitted)). The fact that there is any evidence of actual confusion at all is thus "entitled to substantial weight in the likelihood of confusion analysis." *CAE*, 267 F.3d at 685. This factor weighs heavily in AE Outfitters's favor.

### 7. Defendants' Intent

The final factor is Defendants' intent. Although proof of intent is a "particularly important" factor in the likelihood-of-confusion analysis, *AutoZone*, 543 F.3d at 929, it "is not necessary to prove trademark infringement," *CAE*, 267 F.3d at 686 (citing 3 *McCarthy* § 23:107). Tamman Aboussaf, AE Furniture's president, testified at his deposition that he "had never really heard of [AE Outfitters]" and that when Defendants first received AE Outfitters' demand letters he thought "these people are kidding." T. Aboussaf Dep. at 117, 155. Aboussaf also explained that he did not respond

to the demand letters because Defendants had already registered the AE Furniture mark. *Id.* at 156-57, 160-61, 244. Defendants point to that testimony and argue that the evidence is therefore undisputed that they did not intend to profit from AE Outfitters' goodwill in the marketplace. Defs.' Resp. Br. at 17. That argument, however, fails to take into account all the evidence in the record bearing on Defendants' knowledge of AE Outfitters' mark.

First, Tamman Aboussaf had actual knowledge of AE Outfitters when Defendants expanded their use of the mark to their three retail stores. Aboussaf first learned of the mark when AE Outfitters objected to Defendants' trademark application in 2006. T. Aboussaf Dep. at 114-15; *see also* Hooker Decl., Exh. 33, PTO Office Action. In response to this objection, Defendants acknowledged that AE Outfitters "is a well know[n] shopping mall clothing store." AEF Resp. Office Action at 1. Although Defendants' trademark attorney completed and signed this response, *see id.* at 3, Aboussaf emphatically confirms that he was still involved in the trademark application process and had handled, in his words, "[e]very single paper" involved in the registration and "know[s] it [the registration] by heart," T. Aboussaf Dep. at 100. Defendants' response to the PTO's office-action push-back on the application also underscores that Defendants understood that their mark was only for wholesale—*not* retail—purposes. To distinguish AE Outfitters' operations, Defendants explained that their services would only target "the <u>Wholesale</u> furniture market"and that their customers would therefore likely be more sophisticated than "average consumers." AEF Resp. Office Action at 1 (emphasis in original). The clarity of the limitation on the

21

resulting registration and Tamman Aboussaf's self-professed intimate knowledge of its contents is thus highly demonstrative of intent. *See* AEF Serv. Mark (designating the mark for "wholesale stores featuring furniture").

Next, Defendants only opened their retail stores in malls where AE Outfitters was already operating. T. Aboussaf Dep. at 24-25, 56. If Defendants had opened other retail stores in locations where there were *not* AE Outfitters stores, then there would be some reason to doubt an intent to free-ride on AE Outfitters' mark. But here, all of Defendants' retail stores (all three of them) were placed in malls with an AE Outfitters store. *See* Hooker Decl., Exh. 4, O. Aboussaf Dep. at 29. What's more, Tony Alchuiliti, who owned and operated the Fox Valley store with his brother, knew about AE Outfitters as early as January 2010, when he was deciding where to open his store. PSOF ¶ 11; Hooker Decl., Exh. 6, Alchuiliti Dep. at 31. He also decided to use the name "American Eagle Furniture" in December 2009 or January 2010, and he did not open the store until March 2010. PSOF ¶ 5; Alchuiliti Dep. at 78. Although the AE Outfitters and AE Furniture stores were on opposite sides of the Fox Valley Mall, Alchuiliti Dep. at 35, Tamman Aboussaf admitted that he knew about the AE Outfitters in the Fox Valley Mall because he had to walk by it to get to the AE Furniture store, T. Aboussaf Dep. at 38-39 ("I have to kind of, like, see [AE Outfitters]. They're in my way. If I look up, I have to see them.").

Finally, it speaks volume about Defendants' intent to infringe that they used the important part of AE Outfitters' mark—"American Eagle"—and at the same time did *not* use what Defendants themselves deemed to be the important distinguishing

characteristic of their mark—the image of an American bald eagle and the image of the American flag. When Defendants distinguished their trademark from AE Outfitters' mark in their response to the PTO, Defendants emphasized that "[AE Outfitters] does not use an elaborate American Eagle and flag design with their mark." AEF Resp. Office Action at 1. They continued: "[Defendants'] use of their marks in different channels of trade and the marks each give a different commercial impression." *Id.* But when they expanded into retail sales, Defendants not only switched to using American Eagle Furniture (instead of Titanic), they also decided not to use the "elaborate" design mark on their storefront signs, which they originally asserted distinguished them from AE Outfitters. This, too, shows an intent to infringe. *Cf. AutoZone*, 543 F.3d at 934 ("In some circumstances, an intent to confuse may be reasonably inferred from the similarity of the marks where the senior mark has attained great notoriety.").

In sum, AE Outfitters demonstrated that there are no genuine issues of material fact as to the three most important factors in the likelihood-of-confusion analysis: similarity of the marks, actual confusion, and Defendants' intent. *AutoZone*, 543 F.3d at 929. With the (ultimately immaterial) exception of consumers' likely degree of care, it also has demonstrated the absence of any issues of fact on the remaining factors. Therefore, a reasonable jury would have no choice but to conclude that consumers would be confused by Defendants' use of the AE mark. Because there is no genuine issue of material fact, summary judgment on liability for trademark infringement and unfair competition is entered in favor of AE Outfitters.

## B. Laches

Defendants raise two affirmative defenses against AE Outfitters' claims of trademark infringement and unfair competition: laches and genericness.[11] Answer at 35-36. Turning first to laches, Defendants must show "that the plaintiff had knowledge of the defendant's use of an allegedly infringing mark, that the plaintiff inexcusably delayed in taking action with respect to the defendant's use, and that the defendant would be prejudiced by allowing the plaintiff to assert its rights at this time." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792-93 (7th Cir. 2002) (citation omitted). Although "[l]aches is generally a factual question not subject to summary judgment," *Jeffries v. Chi. Transit Auth.*, 770 F.2d 676, 679 (7th Cir. 1985), "it is nevertheless appropriate for summary judgment where . . . the facts necessary for determining whether the defendant suffered material prejudice are not genuinely disputed," *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003).

Defendants make two arguments in support of applying laches. First, Defendants argue that laches should apply because AE Outfitters failed to enforce its trademark against several other websites that are allegedly also using the "American Eagle" mark. *See* Defs.' Resp. Br. at 9. This argument fails for three reasons. For one, Defendants have not shown that these websites have caused consumer confusion, whereas AE Outfitters had specific evidence that AE Furniture was causing trouble. And, second, the printouts of the websites that Defendants provide with their brief

---

[11]As a reminder, both parties move for summary judgment on the laches defense, while only AE Outfitters moves for summary judgment on the genericness defense. *See* R. 48; R. 58.

simply do not provide enough detail to determine whether these website operators are infringers. *See* Yi Decl., Exhs. 6, 7. As Defendants admit, AE Outfitters has no knowledge as to whether these sites are retail or wholesale websites. DSOF ¶ 19. But even assuming these websites are infringing AE Outfitters' mark, that would not be the basis for Defendants to raise a laches defense. The defense of laches and the related defense of acquiescence[12] are personal defenses. *See* 6 *McCarthy* § 31:43 ("[T]he defense of laches or acquiescence merely results in a loss of rights as against one defendant. A delay in suing other infringers is irrelevant to the defense of estoppel by acquiescence."); 4 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks & Monopolies* § 23:29 (4th ed.) (last updated on Westlaw Dec. 2013); *see also Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir. 1984). In other words, AE Outfitters' supposed failure in going after these other websites was not an assurance that it would not assert its rights against Defendants. *Sweetheart*, 743 F.2d at 1046. Therefore, this argument does not support Defendants' laches defense.

Next, Defendants also argue that AE Outfitters unreasonably delayed bringing suit against Defendants because it knew about Defendants' specific use of the AE Furniture mark as early as April 2007 when AE Outfitters filed an extension of time

---

[12]"Whereas laches is a negligent, unintentional failure to protect trademark rights, [a]quiescence is associated with intentional abandonment. . . . When silence is the basis of alleged acquiescence, the doctrines of acquiescence and laches blend together." *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 933 (7th Cir. 1984) (alteration in original) (internal quotation marks and citations omitted).

to oppose Defendants' mark with the PTO, and then did not file this lawsuit until four years later in April 2011. *See* R. 1, Compl.; Answer at 35. On top of that, Defendants point out that they have been doing business under the name AE Furniture since 2005, and that they have sold AE-branded furniture to over 650 retail stores. Answer at 35-36; Defs.' Resp. Br. at 10.

Opposing Defendants' laches defense, AE Outfitters argues that the Court should reject the defense because Defendants progressively encroached on AE Outfitters' mark. Pls.' Br. at 33-34. The doctrine of progressive encroachment "allows a trademark owner to 'tolerate de minimis or low-level infringements' and still have the right to 'act promptly when a junior user either gradually edges into causing serious harm or suddenly expands or changes its mark.'" *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 823 (7th Cir. 2002) (quoting 5 *McCarthy* § 31.21); *see also* 6 *McCarthy* § 31:20 ("Under the doctrine of 'progressive encroachment,' a trademark owner is not forced by the rule of laches to sue until the likelihood of confusion caused by the accused use presents a significant danger to the mark.").

The doctrine of progressive encroachment applies here. In 2006, Defendants applied to register its AE Furniture design mark for "wholesale stores featuring furniture." AEF Resp. Office Action at 2, 4. Sure, AE Outfitters was aware of Defendants' application. Gibbs Decl. ¶ 8. But because AE Outfitters did not, and still does not, operate any *wholesale* stores or own any trademarks featuring Defendants' slogan or design elements, it chose not to oppose Defendants' registration and instead decided to wait and see whether Defendants' mark created any confusion in the

26

marketplace. *Id.* ¶¶ 8-9.[13] Indeed , starting in 2005, Defendants only sold furniture wholesale under the name Titanic Furniture. *See* PSOF ¶ 34; T. Aboussaf Dep. at 22-23, 105-06; O. Aboussaf Dep. at 9, 29. Defendants only used the AE Furniture mark as a brand name for some of the furniture products they sold out of their warehouse. *See* T. Aboussaf Dep. at 20, 57-58, 78, 100, 105.

It was not until 2009 and 2010 that Defendants opened their three retail stores (indeed, in malls where AE Outfitters had its own retail stores), using the name American Eagle Furniture on their signs. PSOF ¶¶ 4-5, 57-60. This sudden shift from operating a warehouse under a different name to opening three retail stores under the name American Eagle Furniture in malls where AE Outfitters was already operating its own retail stores is a prime example of progressive encroachment. *Cf., e.g.*, *Union Carbide Corp. v. Every-Ready Inc.*, 531 F.2d 366, 388-89 (7th Cir. 1976) (holding that the defendants' suddenly changing the name of one of its own products to include the plaintiff's mark created confusion and defeated a laches defense even after the defendants had been distributing the plaintiff's products that were labeled with that mark for nineteen years), *superseded on other grounds as recognized in Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429 (7th Cir. 1985); *Indep. Nail & Packing Co., Inc. v. Stronghold Screw Prods., Inc.*, 205 F.2d 921, 927 (7th Cir. 1953) (finding

---

[13]AE Outfitters does not go so far as to concede that Defendants' wholesale warehouse operation or even that their using the AE Furniture mark on some of its furniture products is an actual infringement. *See* Gibbs Decl. ¶ 9. But the Court doubts that the warehouse operation alone would constitute infringement because it is in an entirely different stream of commerce.

progressive encroachment when the defendant progressed from using a mark in letterhead to changing its corporate name to include the mark). AE Outfitters learned about Defendants' new retail stores only a few months after the stores opened. *See* Gibbs Decl. ¶ 10. Within one week of learning about the stores, AE Outfitters sent demand letters to Defendants in June, July, and August 2010, and then ultimately filed this lawsuit in April 2011. *Id.* ¶ 11. Given its prompt action after learning about AE Furniture's retail stores, no reasonable jury could find that AE Outfitters inexcusably delayed filing this lawsuit. Therefore, AE Outfitters' claims are not barred by laches, and the Court grants AE Outfitters' cross-motion for summary judgment on the laches defense and denies Defendants' motion.[14]

## C. Genericness

Defendants' genericness defense fails as well. "A generic term is one that is commonly used as the name of a kind of goods." *H-D Mich., Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 759 (7th Cir. 2007) (internal quotation marks and citation omitted). If a mark becomes generic, it can no longer function as a trademark and may be cancelled. *See id.*; *see also* 15 U.S.C. § 1064(3) (stating that cancellation is proper "[a]t

---

[14]Because there was no unreasonable delay in bringing suit, there is no need to address the final element of the laches defense: prejudice. But the record evidence does show a *lack* of prejudice, so this would provide an alternative basis for granting summary judgment for AE Outfitters. It is Defendants' burden to establish that any delay in AE Outfitters' bringing suit prejudiced them. *See Chattanoga*, 301 F.3d at 792-93. Defendants make only one conclusory statement on this point. They state that "[t]he delay in filing suit is not just prejudicial but devastating to the goodwill Defendants have achieved in the retail furniture marketplace since 2005." Defs.' Resp. Br. at 10. Not only is this statement untrue—Defendants did not enter the *retail* marketplace until 2009, *see* PSOF ¶ 4—but Defendants also provide no factual support for this assertion.

any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered"). But once a mark is validly registered, a trademark owner is entitled to a presumption that the mark is not generic. *See Packman*, 267 F.3d at 638. This presumption can be overcome, but it is the defendant's burden to provide "evidence that the mark is merely generic." *Id.* at 639.

Here, Defendants concede that AE Outfitters' mark is validly registered. *See* Defs.' Resp. Pls.' Reqs. Admis. ¶¶ 1-23. Thus, the burden is on Defendants to overcome the presumption that AE Outfitters' mark has become generic. *Packman*, 267 F.3d at 639. But with no citation to any record evidence, Defendants initially only make the conclusory statement that "genericness is the fate of many well known marks." Defs.' Resp. Br. at 18 (emphasis omitted) (citing *Ty, Inc. v. Perryman*, 306 F.3d 509, 514 (7th Cir. 2002), in support of the general observation that "a number of nontrivial words in common use began life as trademarks"). Then, in their Reply Brief, Defendants merely cite the results of a Google search as proof that AE Outfitters' mark has become generic. *See* Defs.' Reply Br. at 8 (citing Yi Decl. ¶ 8; *id.* Exh. 5). But this evidence is not sufficient to defeat a motion for summary judgment. These Google results do not establish that even the shorter mark "American Eagle" has "lost [its] significance as [a] source identifier[] and bec[o]me the popular name of the product"—here, clothing and related apparel and accessories. *Ty*, 306 F.3d at 513 (noting that words such as "thermos," "yo-yo," "escalator," "cellophane," and "brassiere" used to be trademarks, but are now popular names for those products); *see also H-D Mich.*, 496 F.3d at 761-62 (holding that the word "hog" is not generic as applied to a motorcyclist club). The

29

number of Google results may say something of the mark's strength, but here it says absolutely nothing of whether the mark has become generic. Because Defendants have raised no other arguments or cited any other evidence of genericness, summary judgment is granted on this defense as well.

### D. Cancellation of Registration (Claim 4)

The final claim at issue in AE Outfitters' summary-judgment motion is their claim that the Court should cancel Defendants' AE Furniture Registration (No. 3,428,434). *See* Pls.' Br. at 28-32. AE Outfitters argues that there are two independent grounds for cancelling Defendants' mark. First, AE Outfitters argues that Defendants have never used their mark for "wholesale stores," as specified in their registration. *Id.* at 29-31. Second, AE Outfitters argues that Defendants fraudulently obtained this registration. *Id.* at 31-32. As discussed below, the Court concludes that although there is a genuine issue of fact on the fraud argument, the record evidence does demonstrate a lack of use and cancellation is required on that ground.

When applying for a trademark or a service mark, the applicant must verify that the mark is "used in commerce." 15 U.S.C. § 1051(a); *see also id.* § 1053 (applying the same requirement to service marks). Under the Lanham Act, there is little practical difference between a trademark and a service mark: trademarks apply to tangible goods and service marks apply to intangible services. *See* 3 *McCarthy* § 19:81; *see also Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1356 (Fed. Cir. 2009). The Act, however, has different definitions of use for trademarks and service marks. For trademarks, the use requirement is satisfied when a mark is "placed in any manner

on the goods or their containers or the displays associated therewith or labels affixed thereto" and "the goods are sold or transported in commerce." 15 U.S.C. § 1127. For service marks, however, the requirement is met when the mark "is used or displayed in the sale or advertising of services and the services are rendered in commerce." *Id.* If a mark fails to meet this requirement, it is void. *Aycock*, 560 F.3d 1357.

Here, Defendants have a service mark. Defendants' initial application was for "wholesale furniture," but the PTO found this wording to be "unacceptable as indefinite." *See* AEF Application at 1; PTO Office Action at 2. As a solution to this problem, the PTO's examining attorney suggested that Defendants amend their application to apply for two marks: one for "furniture" under International Class 20 (for goods) and another for "wholesale stores featuring furniture" under International Class 35 (for services, including "wholesale outlets"). *See* PTO Office Action at 2; *Nice Agreement Tenth Edition – General Remarks, Class Headings and Explanatory Notes–Version 2012*, http://www.uspto.gov/trademarks/notices/international.jsp (last visited Dec. 12, 2013) (listing all of the International Classes). Notably, once a trademark applicant has clarified or limited the services under its mark, it may not broaden the scope of those services. *See* PTO Office Action at 2 (citing 37 C.F.R. § 2.71(a)). In their response to the PTO's office action, Defendants explicitly deleted their description for "wholesale furniture" under Class 20, and instead opted to describe the mark as applying only to "wholesale stores featuring furniture" under Class 35. AEF Resp. Office Action at 2. This wording is ultimately what appears in their registered mark. *See* AEF Serv. Mark. Therefore, Defendants only have a service

mark explicitly for use in "wholesale stores" services, and they abandoned their application to register their mark for use on furniture products.

Given the limitations of their registration, Defendants make a significant concession when they admit to never using their mark in conjunction with the services they provide through their wholesale warehouse. The types of use generally sufficient to satisfy the use requirement for service marks includes using it on "such things as business cards, stationery, circulars, brochures, invoices, direct mailing pieces, advertisements, store signs and almost every type of printed matter." 3 *McCarthy* § 19:83. But here, Defendants admit that they have never used their design mark or the word mark "AE Furniture" on their warehouse sign; instead, they have only operated the warehouse under the name Titanic. *See* T. Aboussaf Dep. at 22-23, 105-06; O. Aboussaf Dep. at 9, 29. They admit that their wholesale catalog, website, and invoices to retail-store customers display the name Titanic as well. *See* T. Aboussaf Dep. at 58, 105-06; O. Aboussaf Dep. at 40-41, 46-47, 56-57. The only evidence suggesting that Defendants have used the AE Furniture mark in connection with their wholesale services is that their business cards may have displayed the mark. T. Aboussaf Dep. at 106 (explaining that Defendants "probably" use the AE Furniture mark on business cards). But this token use is not enough to raise a genuine issue of fact and survive summary judgment, especially when the company overwhelmingly does its wholesale business under the name Titanic.

Defendants' sole response is that they use the AE Furniture mark on some of the furniture products they sell out of their Titanic warehouse. *See* Defs.' Resp. Br. at 17

("Titanic Furniture served as the wholesale store for American-Eagle-branded products."). But this application of the mark on a *product* does not save the *service* mark from cancellation. *Cf. Lloyd's Food Prods., Inc. v. Eli's, Inc.*, 987 F.2d 766, 768 (Fed. Cir. 1993) (noting the "important" difference between the use-requirement definitions for trademarks and service marks). Furthermore, although Defendants could have registered their mark to use both as a trademark and a service mark, they chose not to. *See* AEF Resp. Office Action. And using a service mark on products does not convert this use into a use for services. *Cf.* 3 *McCarthy* § 19:84 (noting that identical trademarks and service marks are permissible, but should "be the subject of separate registrations"); *cf. also* 2 *id.* § 16:47 ("The fact that a designation is used to identify dealer or distributor services does not mean that that designation also serves as a trademark to identify the source of all the goods sold."). Therefore, cancellation is required, and the Court grants summary judgment based on Defendants' failure to satisfy the use requirement.

AE Outfitters' second independent argument in support of cancellation—that Defendants made fraudulent misrepresentations in their application to the PTO—is not a basis for summary judgment because there are genuine issues of fact. A third-party may petition to cancel a registered trademark if it "was obtained fraudulently." 15 U.S.C. § 1064(3). The party seeking cancellation "bears a heavy burden" of showing that the applicant "knowingly [made] false, material representations of fact in connection with his application." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) (explaining that fraud must be proven with clear and convincing evidence). Appellate

courts have clarified that fraudulent intent requires that the applicant "knowingly [made] a false, material misrepresentation *with the intent to deceive* the PTO." *In re Bose Corp.*, 580 F.3d at 1245 (emphasis added); *see also Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982) ("Fraud will be deemed to exist only when there is a *deliberate attempt to mislead* the Patent Office into registering the mark." (emphasis added)). If there is any doubt about the applicant's intent, the Court should resolve the issue against the party seeking cancellation. *See In re Bose Corp.*, 580 F.3d at 1243.

The Court agrees with AE Outfitters' argument that Defendants' made material misrepresentations to the PTO, but there are issues of fact on whether they made these misrepresentations with fraudulent intent. Defendants arguably made two misrepresentations to the PTO. First, as discussed above, they misrepresented that they were using the AE Furniture mark for "wholesale stores." *See* Hooker Decl., Exh. 38, AEF Statement of Use at 3. Second, they also misrepresented that no other company had the right to use the mark. *See* AEF Application at 4. On this second issue, Defendants knew but failed to disclose that a New Jersey company doing business as "American Eagle Furniture Corp." also had a wholesale furniture operation. Answer ¶¶ 37, 39. In fact, the Aboussaf brothers had actually been ordering furniture from this New Jersey store, which Tamman Aboussaf referred to as "our sister company," as early as 2003 or 2004. T. Aboussaf Dep. at 129.; O. Aboussaf Dep. at 81-82. Tamman Aboussaf and Jimmy Masarwa, the owner of the New Jersey company, had actually

discussed becoming business partners in Chicago, but these plans never materialized. DSOF ¶ 93.

But AE Outfitters has not demonstrated that Defendants acted with the requisite fraudulent intent on either misrepresentation. First, Defendants made no attempt to hide that they were using their mark on products (rather than wholesale furniture services). In fact, they attached to their statement of use a picture of their design mark affixed to a furniture box. *See* AEF Statement of Use at 3, 7 (describing the picture as a "label attached to product packaging"). At best, this demonstrates that Defendants (and perhaps their trademark attorney) did not initially understand the difference between Class 20 and Class 35. But it does not conclusively show that they deliberately attempted to deceive the PTO. *See Money Store,* 689 F.2d at 670.

Next, Defendants argue that they also did not intentionally deceive the PTO when they failed to disclose the New Jersey company because they were represented by trademark counsel. *See* Defs.' Resp. Br. at 18. But this argument is not what saves them from these fraud claims. Oudie Aboussaf himself signed the Defendants' initial trademark application, which contained an explicit declaration stating that "no other person, firm, corporation, or association has the right to use the mark in commerce." AEF Application at 4-5. Moreover, Tamman Aboussaf emphasized that he handled "[e]very single paper" involved in the registration and "know[s] it [the registration] by heart." T. Aboussaf Dep. at 100. Instead, based on the Court's review of the record, it appears that Tamman Aboussaf did an independent Google search with the help of his bookkeeper and found that the "name [was] not taken" because "there was no

American Eagle Furniture." *Id.* at 98, 245. Furthermore, even a trademark search would not have turned up the New Jersey store's mark. Defendants filed their trademark application in February 2006. AEF Application at 2. But the New Jersey store did not file its own application until October 2006. T. Aboussaf Dep., 30(b)(6) Dep. Exh. 32 at 2. Giving Defendants the benefit of the doubt, *see In re Bose Corp.*, 580 F.3d at 1243, these searches and the timing of the two companies' applications suggest that Defendants simply did not understand the true import of the declaration in their application. In other words, there is not sufficient evidence to establish that they fraudulently intended to mislead the PTO when they did not disclose the New Jersey company's use of the mark.

In sum, with regard to AE Outfitters' cancellation claim, the Court holds that even though there is a factual dispute on fraudulent intent, there is no factual dispute on the use requirement. Cancellation is therefore required based on the use requirement alone.

## IV. Conclusion

For the reasons stated above, AE Outfitters' summary-judgment motion [R. 48] is granted on Claims 1, 2, 4, 6, and 7 and also for the affirmative defenses of laches and genericness. Defendants' summary-judgment motion [R. 58] on Claim 3 and laches is denied. The Court contemplates that injunctive relief will be appropriate at the end of this case, but it cannot fashion that relief until the other claims have been resolved. At the next status hearing on January 9, 2014, the parties should be prepared to discuss the next step in the litigation, including whether a settlement conference is

appropriate, or instead moving forward on a trial on the issues of federal and state dilution (Claims 3 and 5), the claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (Claim 8), and damages.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: December 27, 2013